UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

COLBY H. FOSS, III,

                    Petitioner,                    **DECISION AND ORDER**
          -vs-                                     **No. 1:12-CV-0059(MAT)**

Supt. STEVEN E. RACETTE,

                    Respondent.

---

## I.   Introduction

Pro se petitioner Colby H. Foss, III ("Petitioner" or "Foss")
seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254,
alleging that he is being held in Respondent's custody in violation
of his federal constitutional rights. Petitioner is incarcerated as
the result of a judgment entered on June 1, 2005, in Niagara County
Court of New York State, following a jury verdict convicting him of
three counts of Criminal Sexual Act in the First Degree (N.Y. Penal
Law ("P.L.") § 130.50(4)), and Endangering the Welfare of a Child
(P.L. § 260.10(1)).

## II.  Factual Background and Procedural History

### A.   Overview

The convictions here at issue stems from allegations that
during the summer of 2004, Petitioner forced S.D., the
eleven-year-old step-son of Petitioner's half-brother, to engage in
oral sexual conduct on at least three separate occasions. On
July 29, 2004, a Niagara County grand jury charged Petitioner with

three counts of Criminal Sexual Act in the First Degree, and Endangering the Welfare of a Child for the crimes relating to S.D. The grand jury also charged Petitioner with Course of Sexual Conduct Against a Child in the First Degree for crimes he was alleged to have committed against his step-son, J.A.

On December 14, 2004, Petitioner was indicted on additional charges–Sexual Abuse in the First Degree, Sexual Abuse in the Second Degree, Criminal Sexual Act in the First Degree, two counts of Criminal Sexual Act in the Second Degree, and one count of Endangering the Welfare of a Child for crimes relating to T.B, a friend of J.A.'s. The two indictments were consolidated for trial.

**B.    The Trial**

J.A., thirteen-years-old at the time of trial, testified that he lived with his mother, Petitioner, and his four brothers and sisters on Oliver Street in the City of North Tonawanda, New York. J.A.'s mother, Erin Foss ("Mrs. Foss"), worked nights as a bartender, and Petitioner worked as a mechanic in a nearby auto repair shop.

In the spring and summer months of 2004, J.A. testified that Petitioner forced him to engage in oral sex several times a week. Petitioner always initiated these encounters at night when no one else was home. On a couple of occasions, Petitioner went in the bathroom with J.A., ran the shower, and stood J.A. on the ledge of

the bathtub while he knelt in the shower and put his mouth on J.A.'s penis. T.629-34.[1]

On one day in July of 2004, after J.A. and Petitioner returned home late at night from Petitioner's garage, J.A. went into Petitioner's room. Petitioner, who was watching a movie, directed J.A. to lie down on the bed and then lowered J.A.'s pants and put his mouth on J.A.'s penis. J.A. testified that Petitioner also engaged in the same conduct with him in J.A.'s bedroom and in the upstairs portion of the garage where Petitioner worked. J.A. testified that he was afraid to tell anyone about the abuse because Petitioner had threatened to hurt him.[2]

T.B. was J.A.'s best friend, and they would often sleep over at each other's houses. On one night in the summer of 2004, T.B. slept over at J.A.'s house, and both T.B. and J.A. were asleep on the sofa in the living room. T.B. testified that he woke up in the middle of the night to find Petitioner touching his (T.B's) penis with his hand. T.862-69. That same night, T.B. also observed Petitioner masturbating. T.870.

---

[1]
Numerals preceded by "T." refer to pages from the transcript of Petitioner's trial.

[2]
Andrew Dickenson ("Dickenson") was friends with J.A. and would sometimes spend the night at his house. On two occasions, Dickenson saw Petitioner touching J.A. under the covers of Petitioner's bed. T.722-42.

On another night when he was sleeping over at J.A.'s house, T.B. was awakened by Petitioner touching T.B.'s penis. T.871. There was a third occasion on which T.B. was spending the night, and he again was awakened by Petitioner touching his penis with his hand and mouth. In addition, T.B. saw Petitioner masturbating. T.871-72. According to T.B., this occurred several more times throughout the school year.

S.D., the eleven-year-old step-son of Petitioner's half brother, testified that in mid-May of 2004, he slept over at Petitioner's house on the weekends in order to spend time with J.A. T.754, 779-82. One day in mid-May, when S.D. and Petitioner were upstairs in the garage together, Petitioner undressed S.D. and put his hand and mouth on S.D.'s penis. Petitioner told S.D. to "trust him" and threatened S.D. with no longer being permitted to spend time with J.A. if he told anyone what happened between them. T.785-86.

The following night, S.D. was about to take a shower at Petitioner's house when Petitioner came into the bathroom, put S.D. on the sink, and touched S.D.'s penis with his mouth. T.788-89.[3] Petitioner touched S.D.'s penis with his hand and mouth almost every subsequent time S.D. stayed at Petitioner's house. T.790-91.

---

[3]
T.B. saw S.D. go in the bathroom to take a shower, and then saw Petitioner follow S.D. into the bathroom naked. T.880.

The abuse was reported by Amanda Faulkner ("Faulkner"), who lived across the street from Petitioner's garage with her boyfriend and her two children. T.488-89. One day in July of 2004, Faulkner took her son hiking with J.A. and T.B. As they were returning home, S.D., who appeared dirty and disheveled, approached Faulkner's car. T.489-90. When Faulkner opened the car window, J.A. yelled out, "Oh, it's Colby's little cupcake." T.490. S.D., visibly upset, covered his face with his hands. Faulkner got out and gave S.D. a hug, he became teary-eyed. When she asked if something had happened, S.D. shook his head yes and said that Petitioner had "kissed his private" while he was sleeping on the couch at Petitioner's house. T.790-93.

Faulkner decided to take the boys to her parents' home. During the drive, J.A. also confided to Faulkner that Petitioner had sexually abused him "lots of times," and that he did not know what to do because he was scared and it made him feel sick. T.494, 649-50. Later that evening, S.D. told Faulkner and her mother that on another occasion Petitioner followed him into the bathroom, turned on the shower and began "kissing him down there." T.494. Faulkner stayed the night at her parents' house with the boys, and brought S.D. and J.A. to the North Tonawanda police station the following morning.

At around noon on July 18, 2004, North Tonawanda Police Captain William Hall and Detective Larry Kuebler were called into

the station to handle the report of sexual abuse. Detective Kuebler interviewed Faulkner and the boys separately. At around 3 p.m., Detective Karen Smith joined the investigation.

Captain Hall and Detective Kuebler unsuccessfully attempted to find Petitioner at his home and the garage. At about 6:30 p.m., Detective Kuebler reached Petitioner on his cell phone. Petitioner stated that he could not immediately go to the station because he was at a junkyard, but that he would come later. About an hour later, Petitioner called Detective Kuebler to ask more specifically why he wanted to speak to him. Petitioner asked if people had complained "about him picking up kids in his school bus." He then asked if "it was about a boy named Ryan." T.568-69.

When Detective Kuebler again asked if Petitioner would come to the station, Petitioner replied that it would take a while for him to get there. Petitioner also stated that he assumed that he was going to be arrested because everyone had told him the police were looking for him. T.568-69. The following day, at around noon, Petitioner was arrested.

The theory of the defense was that J.A. falsely accused Petitioner of molesting him because he was angry at Petitioner for disciplining him and because he wanted to oust Petitioner from their family. According to the defense, J.A. tried to recruit other family members to conspire with him, and also admitted falsifying

the accusations against Petitioner. The testimony of the defense witnesses is discussed further below, in Section III.

The jury returned a verdict convicting Petitioner of three counts of Criminal Sexual Act in the First Degree and one count of Endangering the Welfare of a Child for the crimes relating to S.D. However, the jury acquitted Petitioner of the crimes relating to T.B., and it could not come to a unanimous verdict on the count of Course of Sexual Conduct Against a Child in the First Degree for the crimes relating to J.A.

### C. The Sentence and Post-Conviction Proceedings

On June 1, 2005, Petitioner was sentenced under P.L. § 70.07 as a second child sexual assault felony offender to concurrent determinate terms of thirty-years on each count of Criminal Sexual Act in the First Degree and one year on the child endangerment count. Five years of post-release supervision also was imposed.

Petitioner's new appellate counsel filed a brief in the Appellate Division, Fourth Department claiming that (1) trial counsel was ineffective; (2) the evidence was legally insufficient to establish guilt and the verdict was against the weight of the evidence; (3) the prosecutor engaged in misconduct during summation; (4) the prosecution improperly offered evidence of consciousness of guilt; and (5) the sentence was harsh and excessive. Petitioner filed a <u>pro se</u> supplemental brief asserting

that (1) his right to an adequate record on which to base his appeal was violated; (2) the evidence was legally insufficient and the verdict was against the weight of the evidence; (3) the prosecutor committed misconduct; and (4) he received the ineffective assistance of counsel. On February 10, 2011, the Appellate Division unanimously affirmed the of conviction in a summary decision. People v. Foss, 81 A.D.3d 1375 (4th Dept. 2011). Appellate counsel sought leave to appeal in the New York Court of Appeals with regard to all of the claims raised in the Appellate Division. On June 30, 2011, leave was denied. People v. Foss, 17 N.Y.3d 795 (2011).

### D.  The Federal Habeas Petition

In this timely filed petition, Foss asserts the following grounds for habeas relief: (1) his right to appeal was violated because he was not provided with a complete set of trial transcripts; (2) the verdict was against the weight of the evidence and legally insufficient to prove his guilt beyond a reasonable doubt; (3) the prosecutor committed misconduct by making improper comments during summation and by improperly introducing evidence of uncharged crimes; and (4) trial counsel rendered ineffective assistance. Respondent answered the petition, conceding that all grounds are fully exhausted and arguing that none of them warrants habeas relief. Petitioner filed a traverse in response to Respondent's opposition memorandum of law.

For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. Discussion

### A.    Denial of Right to Appeal

Petitioner asserts, as he did in his pro se supplemental brief on direct appeal, that his right to appeal was violated because he was not provided with a complete set of trial transcripts, and, as a result, he may have overlooked some meritorious appellate issues. The Appellate Division summarily rejected this claim. People v. Foss, 81 A.D.3d at 1375. Contrary to Petitioner's contention, an unexplained decision of a state appellate court is considered an "adjudication on the merits" for purposes of 28 U.S.C. § 2254(d). E.g., Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011); Sellan v. Kuhlman, 261 F.3d 303, 311-14 (2d Cir. 2001). As Respondent argues, the Appellate Division's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

A criminal defendant has no federal constitutional right to submit a pro se brief to supplement his appointed counsel's brief because he has no federal constitutional right to represent himself and concurrently be represented by counsel. See United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996) ("[Appellant] is really claiming the right to a hybrid defense-the right to have counsel

-9-

examine him and the right to argue on his own behalf. There is no such right.") (citation omitted). Petitioner's claim that his ability to file a pro se appellate brief was frustrated by the alleged lack of access to state court transcripts cannot provide a basis for habeas relief because he was represented by assigned appellate counsel, and he had no constitutional right to "hybrid" representation. See, e.g., Edwards v. Mazzuca, 00 Civ. 2290, 2007 WL 2994449, at *14 (S.D.N.Y. Oct. 15, 2007) ("[Petitioner]'s allegation, that his trial and appellate counsel frustrated his ability to petition the state courts, pro se, and thereby violated his federal or state constitutional rights, also presents no issue for which habeas corpus relief could be obtained. This is so because a criminal defendant has no federal constitutional right to represent himself or herself and simultaneously be represented by counsel.").

Moreover, the claim is meritless. After Petitioner was granted leave to file a pro se supplemental brief, he was provided with all of the trial transcripts. He claims that the set was incomplete because it lacked the transcript of the charge conference, which was held in chambers prior to the jury instructions. The charge conference apparently was not transcribed, and therefore no transcript of it was available. As Petitioner has not claimed that he was denied the transcript of the jury charge actually given, there is no reason why he could not have raised claims pertaining

to the jury charge in his supplemental brief. Accordingly, Petitioner has failed to demonstrate that a constitutional error occurred, much less that he was prejudiced in any way by the allegedly incomplete transcripts.

**B.    Sufficiency of the Evidence**

**1.    Verdicts Against the Weight of the Evidence**

Petitioner principally contends that the verdicts were against the weight of the credible evidence. See Petition, Point Two, pp. 23-44 (requesting that this Court perform the two types of factual analysis provided for by the New York Court of Appeals in People v. Danielson, 832 N.Y.2d 546 (2007), when a defendant requests a weight-of-the-evidence review from the Appellate Division). A weight of the evidence argument is "a pure state law claim" grounded in the Appellate Division's statutory authority under New York Criminal Procedure Law ("C.P.L.") § 470.15(5) to review factual issues. E.g., Correa v. Duncan, 172 F. Supp.2d 378, 381 (E.D.N.Y. 2001). The Court cannot grant habeas review of, or relief for, this claim. See 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"). It is dismissed as not cognizable on habeas review. E.g., Correa, 172 F. Supp.2d at 381.

## 2.    Legal Insufficiency of the Evidence

Petitioner contends that the prosecution failed to introduce proof sufficient to establish his guilt beyond a reasonable doubt. The Appellate Division summarily affirmed Petitioner's conviction without specifically addressing the merits of the legal insufficiency claim in its decision. Nevertheless, this constitutes an adjudication on the merits to which 28 U.S.C. § 2254(d) is applicable. See <u>Sellan v. Kuhlman</u>, <u>supra</u>.

A legal sufficiency claim is based on federal due process principles, <u>see</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979) (Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt), and therefore is amenable to habeas review. Under the clearly established law set forth in <u>Jackson</u>, 443 U.S. 307, <u>supra</u>, a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction. <u>Quirama v. Michele</u>, 983 F.2d 12, 14 (2d Cir. 1993). The habeas court is required to consider the trial evidence in the light most favorable to the prosecution and must uphold the conviction if "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (emphasis in original).

Under New York law, a person is guilty of Criminal Sexual Act in the First Degree when he, being eighteen-years-old or older,

engages in oral sexual conduct with another person who is less than thirteen-years-old. N.Y. PENAL LAW § 130.50(4)). Sexual contact is defined as "any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing." Id., § 130.00(3). "Sexual gratification may be inferred from [a] defendant's conduct[.]" People v. Scerbo, 74 A.D.3d 1730, 1732 (4th Dept. 2010) (citations omitted). A person is guilty of Endangering the Welfare of a Child when he knowingly acts in a manner likely to be injurious to the physical, mental, or moral welfare of a child less than seventeen-years-old. N.Y. PENAL LAW § 260.10(1)). An allegation of sexual gratification can also form the basis of the charge of endangering the welfare of a child. People v. Scerbo, 74 A.D.3d at 1732 (citation omitted).

The prosecution presented testimony from witnesses establishing that thirty-four-year-old Petitioner engaged in oral sexual contact with S.D., who was only eleven-years-old, on at least three occasions. First, S.D. testified that in mid-May 2004, Petitioner touched S.D.'s penis with his hands and mouth while in the auto repair shop. T.785-86. Second, S.D. testified that the following night, while he was at Petitioner's house, Petitioner followed him into the bathroom, sat him on the sink, and performed

fellatio on him. T.788-89. Third, S.D. testified that Petitioner placed his hands and mouth on S.D.'s penis almost every day that S.D. was at Petitioner's house. T.790-91. S.D.'s testimony was partially corroborated by neighbor Amanda Faulkner, who was the first person S.D. told about the abuse. T.790-93. One of the other victims, T.B., testified that he observed Petitioner enter the bathroom naked with S.D. T.880.

Petitioner argues that even if the evidence presented would establish each element of the crimes charged, this Court still must "weigh the credibility of each witness, draw inference[s] from the facts and determine if the jury properly resolved conflicting testimony by giving th[e] proper weight to each portion of the testimony." Petition at 30-31 (emphases omitted). Petitioner incorrectly states the function of a habeas court in regards to legal insufficiency claims. Jackson "unambiguously instructs that a reviewing court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 6 (2011) (quotation omitted). A legal insufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact. Marshall v. Lonberger, 459 U.S. 422,

434 (1983); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues."). Applying the Jackson standard, with the additional layer of deference due under 28 U.S.C. § 2254(d), it is clear that Petitioner is not entitled to habeas relief.

## C.  Prosecutorial Misconduct

Petitioner contends that the prosecutor's summation included comments that improperly shifted the burden of proof and sought to bolster the testimony of the prosecution's witnesses by appealing to the jurors' sympathies. Petitioner also claims that the prosecutor improperly introduced evidence of uncharged crimes. The Appellate Division rejected these claims without comment. People v. Foss, 81 A.D.3d at 1375. This summary decision is entitled to deference under 28 U.S.C. § 2254(d). Thus, to obtain habeas relief, Petitioner must demonstrate that the Appellate Division unreasonably applied the clearly established Supreme Court precedent regarding prosecutorial misconduct.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). Criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing

alone in an otherwise fair proceeding. <u>United States v. Young</u>, 470 U.S. 1, 8 (1985) (context in which remarks were made must be examined to determine the probable effect on the jury's ability to judge the evidence fairly). For habeas relief to be granted based upon prosecutorial misconduct, it must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).

### 1.   Improper Shifting of the Burden of Proof

Petitioner claims that the improperly prosecutor shifted burden of proof to the defense when, according to Petitioner, the prosecutor stated to the jury in summation that "[T]he only thing the defendant had to say was [']no, no, no, no . . . .'" (Petition, p. 7-(5)). This does not accurately reflect the prosecutor's comments.

During summation, the prosecutor stated that Petitioner did two things during his testimony. The first was to "bash" the reputations of the victims, and the second was to deny any participation in the crimes. T.1571. The prosecutor stated,

> And the other thing that he had to do was basically deny, deny, and deny. Did you do anything to [J.A.]? Nope, never. Did you do anything to [T.B]? Nope. That's all he had to remember and get straight one word, no. Did you do anything to [S.D.]? No.

T.1572. These comments did not shift the burden of proof but instead constituted an attack on Petitioner's credibility. Because

Petitioner testified, "the prosecutor was free to comment on that testimony like that of any other witness." King v. Greiner, 02 Civ. 5810, 2008 WL 4410109, at *35 (S.D.N.Y. Sept. 26, 2008) (citing Portuondo v. Agard, 529 U.S. 61, 65-70, 73 (2000) (declining to extend the rationale of Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965) (holding that the trial court violated defendant's right against self-incrimination when it instructed the jury that defendant's refusal to testify indicated "the truth of the prosecution's case") to a prosecutor's comment that the defendant was able to tailor his testimony because he heard the testimony of the other witnesses)); see also Smith v. Barkley, No. 99-CV-0257, 2004 WL 437470, at *4 (N.D.N.Y. Feb. 18, 2004) (finiding that prosecutor's summation comment regarding petitioner's failure to call his girlfriend as a witness was not improper where petitioner testified that his girlfriend accompanied him on the date in question and, thus, could have corroborated his version of events).

### 2. Appeal to Jurors' Sympathies

Petitioner asserts that the prosecutor improperly referred to the victims as "little boys" so as to create sympathy for them and bolster their testimony. Although the prosecutor did refer to the victims as "little boys" at certain points in his summation, this characterization did not misstate the evidence, given that the victims were eleven- and twelve-years-old at the time of the crimes. In any event, assuming that the prosecutor was attempting

to appeal to the jurors' sympathies, the comment was not outside the bounds of permissible rhetoric. Courts have upheld convictions on habeas review where the prosecutor has engaged in much more blatant attempts to play on the jurors' emotions. E.g., Fuentes v. Ebert, No. 06 CIV. 5812PACDF, 2009 WL 1755500, at *13-14 (S.D.N.Y. June 22, 2009) (in a child sexual abuse case, finding no constitutional violation where the prosecutor emphasized that the victim and her sister were young and would always be victims; described the victim as a "little girl . . . with the courage of a warrior"; and portrayed the victim's sister as "a very young girl, a very small girl, just starting to understand things" who would "one day . . . comprehend" the abuse she had witnessed).

### 3.    Elicitation of Uncharged Crimes

Petitioner claims that the prosecutor introduced prejudicial evidence of uncharged crimes during his re-direct examination of Detective Karen Smith ("Smith"). On cross-examination, defense counsel asked Detective Smith if the name "Andrew Dickenson" had arisen during the investigation as a possible victim of Petitioner's abuse. As noted above, Dickenson was a friend of the victims' who had witnessed Petitioner touching T.B. under the bedcovers. Smith stated that Dickenson had been investigated as a possible victim, but after he was interviewed, no charges were brought. T.915-16.

On re-direct examination, the following colloquy occurred:

[Prosecutor]: Now, [defense counsel] asked you if the name Andrew Dickenson was given to you by [J.A.].
[Smith]: I'm sorry, could you ask that again?
[Prosecutor]: Did he ask you-did [J.A.] say that [Andrew Dickenson] was a victim of abuse, not just a witness, was his name given as a possible victim of abuse?
[Smith]: Yes.

T.947. The prosecutor proceeded to ask Smith if J.A. had told her that Petitioner also had molested Dickenson. Smith replied affirmatively. When the prosecutor asked Smith if that was a true allegation, defense counsel objected. The trial court ruled that the question was admissible because defense counsel had raised the subject on cross-examination. The prosecutor then asked if Dickenson denied being molested by Petitioner, and Detective Smith said yes. T.947.

At the ensuing sidebar conference, the prosecutor argued that defense counsel had "opened the door" to questions about other victims whose names J.A. had mentioned to the police. The trial court ruled that the prosecutor could inquire whether the police had received other information from J.A. that, after investigation, was revealed to be accurate. The trial court forbade the prosecutor from asking Smith whether there were other victims. T.948-53. When he resumed his re-direct of Smith, the prosecutor did not inquire about the existence of other victims, but only asked if J.A. had provided accurate information. T.954-55.

The Court agrees with Respondent that the prosecutor did not elicit testimony of any uncharged crimes during the re-direct examination of Smith. Rather, it was defense counsel who, during the cross-examination of Smith, asked about a possible criminal investigation into allegations of abuse by Petitioner against Dickenson. The prosecutor subsequently clarified Dickenson's role in the investigation. Although, off-the-record, the prosecutor requested permission to ask about other potential victims of Petitioner's sexual abuse, the trial court denied that request. The jury was not privy to the sidebar conference and thus did not hear any of the "uncharged crimes" information (i.e., the possible existence of other victims whose names J.A. provided to the police).

### D. Ineffective Assistance of Trial Counsel

Petitioner claims, as he did in his pro se appellate brief, that his trial attorney provided ineffective assistance because he failed to interview potential witnesses, prepare defense witnesses, and introduce photographic evidence. See Petition at 7-(7) to 7-(8). The Appellate Division summarily rejected these claims. People v. Foss, 81 A.D.3d at 1375. Petitioner can obtain habeas relief only if the Appellate Division's decision was either contrary to, or an unreasonable application of, Strickland v. Washington, 466 U.S. 668 (1984).

In order to succeed on a claim of ineffective assistance of counsel under Strickland, a petitioner must show both that his counsel committed errors that were objectively unreasonable under prevailing norms of practice, and that prejudice inured to the petitioner as a result. Strickland, 466 U.S. at 687. In the context of federal habeas corpus review of a Strickland claim, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a petitioner has not satisfied that standard." Id. (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Thus, habeas courts must apply "doubly deferential judicial review" to Strickland claims. Id.

Petitioner specifically attacks trial counsel for failing to properly prepare the defense witnesses. Petitioner does not elucidate the alleged deficiencies in counsel's preparation, and he does not explain how additional preparation would have assisted the defense. He also assails counsel for failing to find witnesses to testify regarding a "vendetta" between Petitioner and Faulkner, the person who first reported the abuse to the police. However, Petitioner has not supplied any information about these purported

witnesses, the substance of their proposed testimony, or assurances that they would have testified. See House v. Miller, No. 02-CV-5379, 03-MISC-0066, 2003 WL 23198788, at *14 (E.D.N.Y. Oct. 27, 2003) (habeas petitioner claimed that counsel erred in failing to conduct interviews with government witnesses, identify or interview potential witnesses; court found claim deficient since petitioner failed to specify who the witnesses were, and what favorable information they possessed).

In any event, Petitioner's claim is belied by the record which demonstrates that each defense witness testified competently and provided helpful testimony. Mrs. Foss, Petitioner's wife and J.A.'s mother, testified that J.A. had hearing problems as a child which led to him having trouble performing in school. T.1270-72. She also testified that J.A. had a bed-wetting problem and that she and Petitioner would often check to see if he wet the bed. T.1283. According to Mrs. Foss, Petitioner would often take a sleeping pill and would sleep through the night. T.1286. After Petitioner was arrested, Mrs. Foss asked J.A. why he was making accusations against Petitioner, and J.A. stated that it was because he wanted Petitioner to return his dirt bike and scooter. T.1319.

Kristie and Cassandra McCleary, Petitioner's step-daughters and J.A.'s sisters, both testified on Petitioner's behalf. Kristie testified that the bathroom door at Petitioner's house did not close all the way because it was broken, and that the sink was

visible through the open door. T.1042-43. Both girls testified that they would always sleep in the living room, even when J.A. and T.B. were sleeping in the living room. T.1048-49. Their other siblings, Josh and Brooke, also would sleep in the living room from time to time. T.1049-50, 1098-1104. Kristie testified that Petitioner sometimes punished J.A. by making him stand against a wall or taking away his belongings, which would make J.A. angry. T.1052-53. Both girls testified that J.A. told them that he wanted Petitioner "out of the picture" so that they could have their old family back. J.A. attempted to enlist their aid in getting rid of Petitioner and told them they if they refused, he would find someone else to help. T.1055-56, 1110-11. According to Cassandra, S.D. told her that Petitioner never sexually abused him and that Petitioner was his favorite uncle. T.1116.

Amanda Rathbun ("Rathbun") testified that she was often at Petitioner's house to spend time with Christie and Cassandra, and that she slept over five or six nights during the summer of 2004. T.1137-41. Rathbun never observed T.B. being sexually molested on the nights she slept over. T.1142. She testified that after Petitioner was arrested, she saw J.A. at a roller-skating rink, and he offered to give her $100 if she would lie in order to help incriminate Petitioner. T.1145.

In mid-June of 2004, Petitioner's mother, Dorothy Robbins ("Robbins") confronted J.A. and asked him whether Petitioner had

sexually molested him. In response, J.A. put his head down and said no. T.1260-61, 1265-66. At the time, Robbins' friend, Martha Marconi, was present, as was Mrs. Foss.

Several of Petitioner's friends, including William Parry, William Steuer, Ryan Kahle ("Kahle"), and Petitioner's half-brother, Steven Niles, testified about their observations of the problematic behavior of J.A., T.B. and S.D., but none had any personal knowledge of whether the children were abused. T.1168, 1193, 1223, 1242. Kahle testified that he lived in the upstairs portion of the auto repair shop from October 2003 until August 2004, and that he never left the building except to go to car shows on Wednesday nights. T.1225. Michael Stachowsi testified that he worked at an auto parts store and witnessed J.A. have a temper tantrum when Petitioner threatened to sell J.A.'s dirt bike. T.1295-96.

It is reasonable to infer that the jurors found the testimony of these witnesses persuasive, since they acquitted Petitioner of all charges involving T.B. and were deadlocked on all charges involving J.A. As the Supreme Court has noted, that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy[,]" Harrington v. Richter, 131 S. Ct. at 791, as is plainly the case here.

**IV. Conclusion**

For the reasons discussed above, the petition (Dkt. #1) filed by Colby H. Foss, III is dismissed. As Foss has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     November 28, 2012
           Rochester, New York.